All right, we'll call the case of the United States versus Kenneth Mitan Miss Flannery, are you ready to proceed? May it please the court. Good morning, Your Honors. I'm Ann Flannery. I represent Defendant Appellant Kenneth Mitan, and I would request five minutes to be reserved for rebuttal. I'll start with the prejudicial variance issue. The scheme at the trial of this matter differed materially from the scheme that was in the indictment. The shell accounts, which were the main focus of the indictment, were not shell accounts. A huge aspect of the trial focused on the allegedly fraudulent use of company assets to pay the sellers, which was not alleged at all in the indictment. And another aspect that was focused on at trial, which the government conceded at the end of the first trial day, it had flushed out that day, was that there was a misrepresentation made to the sellers that the defendant intended to grow the companies. And this was not done, putting mismanagement squarely an issue here when those issues had not been put forth in the indictment. The defendant was prejudiced by this shift, first of all, because he had a Fifth Amendment right to have the charges against him returned by the grand jury. And I would direct Your Honor's attention to the Camille case, which I did not cite in my brief, but I did give notice to the government, U.S. v. Camille, C-A-M-I-E-L-689-F-2-31. That's a Third Circuit case right on point where the indictment was dismissed and that was affirmed by the Third Circuit because the scheme at trial differed from the scheme that was charged in the indictment. A large aspect or a separate aspect of the prejudice to the defendant is what I will call the block and parry prejudice. The government was allowed to parry, if you will, with allegations outside the indictment that the use of company funds to pay the sellers was fraudulent. And this, I excerpted a good bit of the testimony in my briefs to give Your Honors a flavor of how important that was in the trial through testimony and that the jury was allowed to consider that. But when the defendant attempted to respond by, for example, putting forth a business transactions expert that would explain that this is not fraudulent and that a depletion of assets after this is done is a normal consequence of using seller assets to pay and that this was allowed in the contract. When the defendant attempted to put that evidence forward, he was blocked expressly. Where was the offer of proof on what this expert would have said? Especially with respect to what the contract allowed or contracts allowed? This was a CJA case, Your Honor, and the court was controlling the funding over whether the expert could be retained. We had a relatively bare bones proffer because we could not hire him. But what we expected him to do was look at the contracts and testify that it was not prohibited by the contracts. Well, what the district court did do is charge the jury with precisely what that expert would have said. I disagree, Your Honor. The court charged the jury that standing alone, this would not be a badge of fraud, but it could be considered with all the other evidence and that a failure to disclose could be considered if it was a contractual obligation. One of the problems I have with your prejudicial variance argument is that at bottom it is, if it's not specifically alleged in the indictment, then it can't be proved at trial. Now, you have an overarching used false and fraudulent pretenses to obtain that evidence. You have a number of other things that we can look at, but it's not my understanding of the law on prejudicial variance to say if it's not the specific misrepresentation or act. If it is not specifically explicitly named in the indictment, you cannot use it. You have to show these four things you allege, surprise and prejudice. I don't think there's anything in this case that's a surprise. This case was litigated and your pro se defendant, your pro se client got a wonderful representation from you. Thank you, Your Honor. First, I'm not contending that the law is that everything has to be laid out in the indictment. What the prejudice was is that the court looked at the indictment and based on what was not in the indictment, blocked the defendant from bringing in evidence to counter. And let me direct Your Honor's attention to the supplemental appendix at 2118 and the appendix at 1859, where the court denies the expert and states the primary reason why I think this is inadmissible, is that it does not relate to the charges in the indictment. There's nothing in the manner or means or overt acts that in any way says that the use of the company's cash to fund the purchase was mentioned or was a manner and means or was illegal or improper or anything else. So it's a very specific complaint I have, Your Honor. He charged the jury that standing alone it couldn't be considered. And that's what you said at page 1859 of the supplemental appendix. You said you'd expect that Mr. Purcell would testify that it is a natural consequence and a normal consequence of leveraging or utilizing the assets to purchase the business and not in itself an indicia of fraud. And that's exactly what the judge charged. What wasn't charged and what was not in the case was that the contracts allowed it and there was much testimony by the sellers that it was unfair. So there was no testimony. I'm complaining about the fact that the government was allowed to put in a lot of evidence and argue about something that wasn't in the indictment while the defendant was blocked from responding to it because of the limited language of the indictment. One of the things you mentioned was the post-closing fraudulent acts, the continued fraud long enough to drain the company's assets. And you specifically mentioned the vexatious litigation, right? Yes. And the defendant was... But that was explicitly you received notice of that when the government moved under 404B three months before trial. Correct, Your Honor. And our argument there, our complaint there is not notice. It's that there was no evidence that the litigation was part of the conspiracy and the judge continually through the trial put off ruling on that. So you're not arguing that that was a prejudicial variance? I'm arguing that the prejudicial variance cases don't require surprise and prejudice. They require surprise or another. Are you sure about that? I believe so, Your Honor. It made the charges a moving target and I'll direct your attention to Appendix 848 where I am absolutely puzzled after the testimony of the seller and Ingalls attorney. Because there has been no testimony that would put litigation as part of the conspiracy. And yet the government was still trying to hang the admission of the deposition testimony on the theory that the litigation was part of the conspiracy. I'd like to move, if I may, to the phone call issue. I don't really still understand that answer because at page 2045 the government stated its theory that the defendants, quote, frequently use litigation or the threat of litigation to intimidate victims as part of their scheme. That puts you on notice of this aspect of the government's case. There is notice, Your Honor, but I would respectfully disagree that that is the only prejudice that would give rise to dismissal. Okay, but you're not alleging it's prejudice because it was not in the indictment? No, I'm alleging with respect to the litigation that the prejudice was, it was a moving target. The judge didn't rule on that. And the judge admitted the co-conspirators test or the deposition testimony, which was a Crawford violation. I haven't been asked to address that, but I would ask, I'll rest on the briefs on that. With respect to the phone calls, it's undisputed that the prosecution team, the case agents, listened to phone calls of a pro se defendant discussing witnesses he may call and other legal strategy. The government's interpretation of the protocol that it drafted as justifying the prosecution team in listening to these phone conversations is inconsistent with everything that the prosecution team did. There was nothing else in the record and that was happening at the time of that protocol and everything else that would happen with this subsequent. Mr. Miten's motion that led to the protective order, which is found at APT 2073, clearly requests protection from the Bureau of Prisons disclosing to the U.S. Attorney's Office any legal defense work product, any contents of discussion to the U.S. Attorney's Office. Mr. Miten's email telephone conversations between Mr. Miten and potential witnesses and any other material reasonably related to the defense of his case. And he accompanied that with another motion to keep the case agents from knowing what he copied. He clearly did not want the Bureau of Prisons to be transferring defense strategy information to the U.S. Attorney's Office. Specifically, he was concerned about his communications with his mother, was he not? His mother was a, he called, the phone calls, your Honor is right, were going to his mother's number. His mother was a potential witness in the case and his mother, each time he called, would hand the phone off to his brother, Keith, who was also a potential witness. He had been the attorney for the acquiring company in all these transactions. Didn't people think that was involving obstructing justice, weren't they? Not that, your Honor, the government had some theory about obstruction of justice, but it wasn't that. If Keith was acting as one of his, this pro se defendants, many attorneys, if he hadn't been suspended at the time, why didn't he call him on the privileged phone line? He wasn't allowed. The only calls he could make on that line were to an attorney. To an attorney. Yes, so that's why he had a problem. He's seeking legal advice and engaging in legal discussions with Keith, it wasn't his attorney. There's no allegation here that those calls to the mother and Keith were privileged calls, really. Not privileged, but, your Honor, what Mr. Miten had said. They weren't confidential because he had signed the waiver saying that the prison can monitor these calls. They weren't confidential with respect to recording by the Bureau of Prisons. They weren't privileged and they weren't confidential, so what do you really have left? Well, I direct, your Honor, the court made findings that we believe were correct. Kenneth was unable to use, I'm referring to the appendix at 2209 in the court's September 25th order. Kenneth was unable to use the FDC's privileged telephone lines to make these calls. Nevertheless, he is entitled to prepare his defense with communications with witnesses, investigators, and experts without knowledge of the prosecutors in this case. He says in some submission, I probably have it here in the rubble someplace, that he had asked someone at the prison to use, to call his mother or something, make a call on the non-monitored line and he was denied that. And that was why he kept seeking these protective orders. Yeah, but then, why wasn't he in screaming that I'm trying to call Keith, my lawyer, my lawyer, and they won't let me call? He did, your Honor, he did, by filing those protective orders. When I commented to him as standby counsel... Well, Keith couldn't have been his lawyer. He was suspended on January 9th, 2009. But the issue is an attorney-client privilege, your Honor, with all due respect. It's Mr. Mighton's right under the Sixth Amendment as a pro se defendant. How was he prejudiced? The district court made findings after listening to several recordings. The district court did make findings. One of the things the district court pointed out was that although he had no reason to expect privacy, that did not equate to giving the agents and prosecutors consent to listen to his phone calls. But they weren't confidential calls. They were calls about defense strategy. And the court found that the government's conduct was overreaching. But where the third party listens to them, they are not confidential calls. That may be true, your Honor, in the absence of all the protective orders that the court imposed. The court told him in the July 28th order, you don't need a protective order. The Bureau of Prisons will not give your phone calls to the prosecutor. In the context of this case, he believed and the court believed that he, the court, was granting confidential communications. How was he prejudiced? Prejudice should not have been the standard. That's where the court erred. Under Weatherford, when the government intentionally intrudes into defense strategy, into defense communications, and this was clearly intentional, they clearly knew that these were legal strategy discussions. No prejudice is required. And this court in Levy has explained why. It's because a court cannot determine how the government's knowledge of any part of the defense strategy might benefit the government. So if we disagree with you and say that prejudice is required and you have been unable to articulate prejudice, which you've made quite clear in your papers. We're unable to know how this impacted, if indeed it did. So you've not made, you concede you've not made a showing of prejudice, whether or not it's impossible to do so or not. I can speculate as to why there was prejudice, but I can only speculate because I don't know what was going in the mind of the government. And that's why this court has found prejudice to be an inappropriate standard. Good morning. Good morning, Your Honors. May it please the court. My name is Scott Cullen. I'm an assistant United States attorney and I represent the government as appellee on this matter. And you're arguing the variance in prison call issues. I am arguing the variance in prison call issues. Your Honor, I'll start with the variance. There was no variance in this matter. Contrary to the representations that the appellant makes in his briefs, the government's theory of this case was clear and consistent throughout the pendency of the matter below. It was charged in the initial indictment, it was charged in the superseding indictment, and it was consistent through the trial all the way to conviction. That theory of the case was that the appellant, Mr. Miten, and his co-conspirators used false and fraudulent pretenses to gain control of these victim companies, didn't pay the victims the full amount promised under the contracts, gutted the companies, and left them in a state of economic ruin by the time that the victims attempted to retake control of the companies from Mr. Miten. That was clear as day throughout the pendency of this matter. Now, all of the evidence that the appellant characterizes as a shift, characterizes as a variance, is really just what I described it as. It's evidence, and I think Judge Barry's line of questioning to counsel for the appellant really gets to the heart of this issue. This was a clearly articulated, detailed scheme in the indictment, and all of the evidence that was introduced at trial went directly to prove that scheme as charged. And that alone, Your Honors, is sufficient to end this inquiry on the variance. But if we want to take it a level deeper, and the government does this in its papers on this matter, if we want to take this a level deeper, all of the four types of evidence that the appellant argues was somehow prejudicial, somehow a surprise at trial, were clearly captured by the language of the superseding indictment. The notion that there was going to be evidence of post-closing conduct was explicitly referenced in the superseding indictment. Litigation was explicitly referenced in the superseding indictment. And the notion of the source of funds, and the promises to grow the companies after closing, was clearly captured in the language of the superseding indictment, referencing false and fraudulent pretenses. So then if we take it a level lower, and we go and look at the specific language of the superseding indictment, we're again at a point where we can end this inquiry, because the superseding indictment explicitly referenced, these types of evidence. But if we want to take it yet another level down, and go to the prejudice question that Your Honors asked the appellant about briefly, I think Judge Barry's questions regarding the 404B motion again get to the heart of the issue. If we take it a step down and we look at that 404B motion, which was filed just five days after the superseding indictment was filed in this matter. As if the detailed indictment itself wasn't enough, the 404B motion explains the scheme to defraud, in greater detail, makes explicit references to litigation as part of the scheme to defraud, makes explicit references to post-closing conduct, makes explicit references to these aspects of evidence that were introduced at trial that the appellant now claims was a surprise. And so even if we were to, for the sake of argument, assume that there was some sort of variance, our inquiry ends on April the 28th, I believe, of 2009, when the 404B motion was introduced. Because at that point, it was filed, because at that point there could be no argument of prejudice. The appellant was on clear notice of all of this evidence. And then even if we were to take it a step beyond that and look at the specific areas of prejudice that the appellant enumerates in detail in his briefs, all of those fail on the merits when you look at this record. And I'll just go through them very briefly. I just want to touch on them. With regard to the business transaction expert. The proffer for the business transaction expert suggested that the appellant wanted to have the business transaction expert testify as to matters that were not in dispute and not relevant before the jury. The question regarding the source of funds issue. The question regarding whether or not source of funds was. Ms. Flannery says that the expert would have testified that under the contracts, the company's funds, the target company funds could be used to pay the purchase price. And why wouldn't that be relevant? The issue wasn't the content of the contracts. It was whether or not the contract allowed the victims to believe that they were going to be paid with funds other than those. If the contracts allowed it, wouldn't that be the controlling consideration? The controlling consideration, Your Honor, is whether or not there was a false and fraudulent pretense by which the victims were allowed. And we have the parole evidence rule when dealing with contract cases. Might say one thing, but if it's in the contract to the contrary, you're bound by what you signed. Well, Your Honor, I would note that the appellant had access, obviously, to the contracts, which were exhibits at trial. The issue here is whether or not the victims were misled in some way to believe something about the source of funds that was untrue. And to that extent, I know you're saying you wouldn't need an expert to say whether the contracts allowed for the use of the funds. You wouldn't need an expert. And, Your Honor, what I'm saying is what you really wouldn't need is an expert to get to the question of whether or not the victims were misled. What you need to get to that issue is what the jury had in this instance. And that is access to the extensive detailed testimony of the victims and the day and a half of direct testimony of the appellant himself, which in the instance of each victim were the two parties involved in the negotiation. That's what the jury needed. That's what the jury had. There's no prejudice with regard to the business transaction. I still can't understand how that could not be bad. I mean, if I'm selling my business, I'm amazed that I have to pay for it. But that's, I guess, I don't understand the law. Mr. Allen, Judge Barry, I would simply say that the record reflects that the jury had everything that they needed to make a determination as to that issue. I can understand their shock, quote unquote, when this happened. One specifically is the fraud here. Are you saying there was a representation, there was no representation as to where the funds were coming from, and they took them from the subject companies so that there was no fraud involved in that? Judge Karahi, the ultimate fraud here was that the defendant, through numerous false and fraudulent pretenses, and the source of funds was just one of them. The false name was another one of them. The promise to grow the companies was another one. Through numerous false and fraudulent pretenses, the appellant deprived the victims of their companies without making full payment as promised under the contract, and then gutted them after he took control of them, used them as a cash cow, and then left them in a state of ruin when the victims attempted to take control of them. But using them as a cash cow, that's questioning the source of funds. But you're saying that there were or were there not representations as to the source of funds before the completion of the transaction? The evidence that we introduced, Your Honor, the evidence does not reflect, and I think the appellant, to some extent, makes more of this particular aspect of the case than the full trial record reveals. The evidence with regard to source of funds was that several of the victims were surprised to learn when they found out that they were being paid through funds that were taken from the company itself. We also introduced the stock purchase agreements, which we submitted to the jury, offered a clear inference to the victims that the source of funds was going to be coming from some third party, the Williams Fund Private Equity Group, or in the case of Prucino Brothers, CP Produce and Foods. Let's go to the phone calls issue. Certainly, Your Honor. Monitoring the phone calls, that the prosecution team was monitoring the phone calls. Yes, Your Honor, the district court did express surprise to this end. I think it's important to put that surprise in the context of the district court's conduct and I think the government's conduct throughout the entire pendency of this very complicated matter. From the minute that this case came before the district court, it took great pains. It took extraordinary pains, and I use the word Herculean in our briefing, and I think it's appropriate, to protect the appellant's rights as an incarcerated pro se defendant. The government submits, and it's clear on the record, the district court, I believe, had a different view or a different understanding of the first paragraph of the protocol than the government. The government, nonetheless, has submitted throughout that that protocol makes it abundantly clear the appellant was required to go through the established channels at the FDC if he wanted to have any confidential private communication with regard to his legal defense. Could the defendant have gone to the Bureau of Prisons or the Federal Detention Center and said, add my mother's phone number to the privileged call. I know I can make a phone call to her because I'm going to be discussing strategy? Your Honor, I would note that the appellant actually did do that after this issue came to light. I don't know how that squares with Bureau of Prisons' established procedures. I'm not completely fluent in those. He apparently did do that after this issue came to light. But I also note that the district court, in maintaining a steady hand on this very complicated issue throughout the pendency of the litigation, instructed the appellant after he appointed Ms. Flannery as a standby counsel, instructed the appellant, ordered the appellant to make ample use of Ms. Flannery in facilitating various aspects of preparing his defense. So to the extent that he wanted to have a communication and he wanted to keep it confidential and he couldn't do it directly through the normal FDC phone lines, he certainly had access to his standby counsel and he certainly had the opportunity to have a privileged non-monitored phone call with his counsel and to proceed that way. Now, Your Honors, again... Do you agree that prejudice is not required? I don't agree that prejudice is not required. The prejudice requirement that the appellant is arguing doesn't even come in here. I think that really comes from the Costanzo case, this Court's Costanzo case. And that really comes from the third prong of Costanzo and the government's position is that we're not even in the realm of the Costanzo case here. Because if you look at Costanzo, if you look at Levy that the appellant invokes, they are entirely distinct from this situation in a couple of ways. First of all, and I need to emphasize this because it's very important, all of this Court's cases in that realm address communications that are clearly subject to attorney-client privilege. And that is simply not the case with any of the communications at issue here. And so for that reason, we're not in the realm of Costanzo. The other reason is, if you look at Costanzo, if you look at the fact patterns in Costanzo and Levy, you're looking at fact patterns where it's abundantly clear that the defendant in those cases has some reasonable cause to believe that his communications are confidential, are subject to some sort of privilege or protection, and the government informers in those cases have some legitimate reason to think that they are not. And it's the exact opposite situation here, Your Honors. In this situation, given the protocol, given the context of the signed waiver at the FVC, and given the fact, and I think it's important to make this point as well, given the fact that the record below clearly shows that the appellant was aware that his calls were being monitored, the district court made a finding in its ultimate ruling on this that the recordings reviewed indicated on multiple occasions that the appellant was aware that his calls were being monitored and instructed his brother not to address certain matters on the phone because he didn't want to talk about them. Given that context, we're not in the land of Costanzo. I see my time is... But even in Costanzo, where the government was secretly spying on conversations between the defendant and his lawyer, we still found no Sixth Amendment, no intrusion into the defense camp, no Sixth Amendment violation. That is, in fact, true, Judge Barry. You did find that there was no Sixth Amendment violation. And I see my time has expired, so I'm going to yield to my colleague, Mr. Conn,  Thank you, Your Honors. Good morning. May it please the Court. My name is Assistant United States Attorney Joseph Conn, and with our remaining time, I would address the argument regarding the sentencing guidelines, specifically the issue of loss amount as calculated under Section 2B1.1B1J. And we would ask this Court not to disturb the finding of the district court because, specifically, Mr. Mighton has not met his burden, which is required, of showing as clearly erroneous the district court's factual findings, specifically that Mr. Mighton's intent when he committed a fraud was to deprive his victims of the full value of their companies, and that those companies at the time that he committed the fraud were worth somewhere between $2.5 and $7 million. The district court, Your Honors, did its duty in making a reasonable estimate of the intended loss in this case based on an abundant record, which it was obligated to go through and weigh appropriately. Moreover, if there were any errors that were committed by the district court in this case, we would maintain that those errors were harmless for the reasons we outlined in our brief and the reasons I can go through for the Court this morning. To begin, Your Honors, the Court appropriately found that the appropriate loss amount in this case to be used for purposes of the sentencing guidelines was $5.27 million, and that was based on an intended loss amount. And obviously, if the intended loss were to be higher than actual loss, that would be the appropriate measure. It was the contract price. Exactly, Your Honor. And what the Court was faced with doing after having the benefit of an abundant record from trial and sentencing and other proceedings in the case was to try and ascertain what would be the best way to capture that greatest harm that the guidelines want to be recognized in the sentencing guidelines. And so what the Court was presented with were a number of options in making a decision about which option to choose from. The first option was the option that the Court ultimately adopted, which was using that sale price, the price that the defendant himself, Mr. Mighton himself, articulated as what the worth of that company was when he sought to obtain it. That was the first theory or possibility presented. Then the government presented two measures of actual loss that the Court could also consider if the Court did not agree with the government's reasoning. The government presented one calculation based on a number of records as well as estimates from the victims, which require the Court to find those estimates to be credible and reasonable. And another theory or another version in which the Court rejected those estimates, there were still hard, undisputable records that established those loss amounts. Is the restitution amount the actual loss here? Under the government's theory, that's correct, yes. I don't think so. I thought the actual loss was 4.1 for purposes of the calculation, but for purposes of restitution, the loss was 1.6. Because you could only order restitution as to the four indictment victims and the actual loss figure, he also included the 2404B victims. That's exactly right, Your Honor. So that's two different figures. To clarify my remark, the government's view was that as victims of the same fraud under Title 18, that the Court could order restitution for those other two victims. The Court disagreed, and therefore the actual loss for restitution purposes was different. The Court is correct. So we have these three possibilities presented by the government. The Court also had a set of figures presented by U.S. Probation which did not reflect the Probation Office's view of intended loss, but rather actual loss, and their calculations were provided in the pre-sentence report. All four of these alternatives were certainly in excess of $2.5 million, which was the threshold amount for the application of 2B1.1B1J. The only other alternative that was presented to the District Court in terms of for many of the advocates who were from the Probation Office was the arguments of Mr. Miten. And Mr. Miten suggested to the Court that the Court should just look at the actual gain to him, which as this Court knows, is only to be done when you cannot ascertain intended loss, you cannot ascertain actual loss, and in fact was consistent with the strategy that was presented. Because while Mr. Miten, as was and is his right to do, disputed his guilt, maintained that he did not intend to defraud anyone, the jury rejected and certainly the District Court rejected that view, and the District Court made a specific factual finding that the defendant did obtain to obtain the full value of those companies. So the only other alternative that was presented to the Court was a figure that was less than a tenth of what the Court actually found in terms of what appropriately captured the loss amount. And what we're stuck with today is the simple fact, or what Mr. Miten is stuck with, is the fact that there's no basis for finding as clearly unreasonable, the District Court's decision, that if we're going to look at the actual worth or the approximate or estimated worth, a reasonably estimated worth, of six companies that were doing business, that were being bought in roughly 2005, 2006, that those six different companies that were doing business with various vendors were worth more than $2.5 million. There simply isn't anything to suggest that was unreasonable. And what cannot be ignored is the District Court's specific factual finding that Mr. Miten intended to cause the — to obtain the full value of that company. Now, Mr. Miten, to point to some sort of error, makes claims about the Court making failures regarding certain offsets. And I would note at the offset, along with the other arguments we've made about harmless errors, that as we've identified the claims that have been made in the briefings, if you were to add up those offsets in terms of money that Mr. Miten disputes as, you know, money that was really paid to the victim, you can look at the estimates he provides, for example, Benny's Cheese, where he claims that more money was given to Benny's Cheese than they bargained for, which, again, would be inconsistent with the finding that he defrauded that company. Well, if — am I right in saying this? He has to receive credit for $2.7 million of payments and different things and inventory for the 18-level enhancement to drop to a 16, to be under $2.5 million. And he only alleges, and I think this is quite confusing from the appendix, I know it's supposed to be one simple exhibit, quote-unquote, but it didn't seem simple to me. He only alleges, at best, look, everything, looking at the figures in the light most favorable hint, $2.04 million. So that even under Mr. Miten's figures, he's still not up to the 2.7. And he needs to drop the enhancement so he can get, you know, a level 33 and a 16 and a lower sentence. That's exactly right. And as the Court has well established that if the final guideline range is not affected, that it would be harmless error of the Court. Well, the final guideline range would be affected if he's right. If he's right that we go below 2.5. That's right. To get there, we'd have to accept his arguments on credits against loss. And the arguments about credits against loss, again, would require this Court to find as clearly unreasonable and impermissible conclusion that the defendant's intention when he was doing like the defendant in the Stein case we quoted, when he was paying certain bills, that that wasn't to keep this conspiracy going to prevent victims from blowing the whistle on him, calling their lawyers, calling the police, calling the FBI, but simply to maintain the term that was used at trial to keep the company on life support so it could continue to drain the assets from that company. Mr. Miten certainly argued against that interpretation at trial, but there's no basis for finding the district court's disagreement with his characterization or his interpretation as clearly unreasonable. I see my time is up, and I thank the Court. Thank you very much. To start with loss, the Court's finding that the face value of the stock purchase agreements was the intended loss was clearly erroneous because, first of all, the sellers were paid almost a million dollars, and that amount should be subtracted from the total. The Court also included $750,000, which was a building purchase that was never consummated, and it was collateralized. So even if it had been consummated, that $750,000 shouldn't have been included under comment 3E2 to 2B1.1 because it was fully collateralized. And to address Judge Barry's point about harmless error, the inclusion of the 404B transactions, which was procedurally not just unreasonable but outrageous, that added $2.7 million. The judge actually didn't even make a specific finding as to what the loss was on those companies. The Court couldn't have. There wasn't enough evidence in the record to ascertain what, if any, loss there was. But the judge just arbitrarily said that adds $2.7 million. So it certainly would have brought him down two levels or even four levels had the Court not clearly erred in using the pure face value of the stock purchase agreements. The actual loss that the government calculated and that was used in the restitution figure was very odd. It was the amount diverted as well as the accounts payable at the end of the defendant's control. And that was double counting. What was diverted is equivalent to what wasn't paid out to the vendors, and it also doesn't take into account that there were substantial accounts payable owed by these sellers at the time that the defendants took control of the company. To go back to the variance, I would urge your honors and respectfully request that you look back at the standard because surprise, I submit, is not the test for prejudicial variance. For example, Camille spillover effect was viewed as the prejudice. Judge Barry's shock in response to the company quotes. No, no, that's in quotes. That was one of the victims used the word, I was shocked. Yes, Your Honor. I'm not shocked by that. I was surprised, but I wasn't. That was the victim who said it. Right, and that was what was conveyed to the jury, and that is why an expert would have been so important. Under 702, it's very important and allowable for an expert to testify as to things that are not in a lay witness's ordinary experience, and it should not have been shocking to these witnesses. And to answer Judge Vineski's point, no one could look at these contracts. They were two inches thick, and they were silent as to where the money was coming from. So you needed an expert to interpret that. You needed someone who could take that contract and explain to the jury why this wasn't shocking and why it was not a badge of fraud. With respect to the phone calls, Judge Vineski asked why didn't the defendant go and try to keep his phone calls privileged. Well, he tried, and he could not use the privileged line. Remember, he's a pro se defendant, and under the Sixth Amendment, he has the same right. It's a constitutional right to prepare his defense. Why didn't he call you on his privileged line? With all due respect, Your Honor, he... He would have stood by counsel and say, work this out. But under Faretta... Even though I'm not represented, I want to call on the privileged line, and he could have called you. That takes away from his Faretta rights, Your Honor. He has a constitutional right under Faretta to prepare his defense. Well, yeah, that's right. That's why he could have called standby counsel. And I don't know the difference. Hybrid counsel, standby counsel, you really function very much as his lawyer, and he could have called you. Your Honor... There's no impediment. Your Honor, perhaps if you had been the district court, that's what you would have told him, but he was told by the district court in that July 28th order... No, no, no, no. When you've read this whole record, this was not the poor, unknowing, unintelligent defendant that the law is designed to... This is a lawyer that's a very intelligent man. And, I mean, he knew he had a privileged line, and he knew you were his standby counsel. And, Your Honor, if you look at the court's orders, the court understood and conveyed to him that his calls would be protected from the prosecution team. The prosecution should have been using a taint agent. They should have informed the court, at least ex parte, that they were doing this. And the interpretation of his phone calls as conveying that he knew they were being listened to by the prosecution is, remember, these phone calls were limited to 10 minutes, and they had to be paid for. So, for example, in the excerpt I put in my brief, he does say, I don't want to talk about this on the phone, I've written you a letter. But then he goes on in the next sentence to talk about another witness that he wants to call. That was kind of the false exculpatory. You've got to tell them why you used... So one could read that a little differently. If I may spend a moment to conclude. I think we're fine. It's okay if you want to. If you want to conclude, go ahead. I would just suggest that this is a situation where the government very much wanted to convict, the court very much wanted to incapacitate, but the ends don't justify the means. And Mr. Miten's rights were violated time and time again in this case. Thank you very much, Ms. Flannery. We'll take the matter under advisement.